*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| TERRI REYNOLDS-ROGERS, | ) | |
| | ) | Supreme Court No. S-16409 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-14-09825 CI |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 7340 – March 8, 2019 |
| SOCIAL SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Terri S. Reynolds-Rogers, pro se, Palmer, Appellant. Elizabeth M. Bakalar, Janell M. Hafner, Assistant Attorneys General, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

MAASSEN, Justice.

## I.      INTRODUCTION

A former employee of the Department of Health and Social Services (DHSS) brought a wrongful discharge suit against the State. At the time of her termination she had four union grievances pending against DHSS, and her union filed

another based on the termination. The union settled all five grievances in exchange for a payment to the employee. She later sued DHSS for wrongful termination, alleging both breach of the covenant of good faith and fair dealing and several torts, including retaliatory discharge and failure to accommodate her disabilities. The superior court granted DHSS's motion for summary judgment and entered final judgment against the employee.

We conclude that the superior court was correct in deciding that the employee's claims were resolved by the settlement of her grievances, were barred by the statute of limitations, or were legally insufficient in light of the undisputed facts. We therefore affirm the superior court's judgment.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

#### 1.    Work duties

Terri Reynolds-Rogers (Rogers[1]) began to work for DHSS as a Health Program Manager I in August 2006. She has a bachelor's degree in zoology and completed two years of medical school. Her job duties with DHSS involved implementing the Medicaid program: she began by screening paperwork from nursing homes and hospitals related to authorizations for long-term care and was later given duties related to the Medicaid Waiver program.[2]

---

[1]    The appellant identifies herself as "Rogers" in her brief, and we follow her convention.

[2]    The Medicaid Waiver program "provide[s] disabled Alaskans with in-home care services as an alternative to institutionalization." *Radebaugh v. State, Dep't of Health & Soc. Servs., Div. of Senior & Disabilities Servs.*, 397 P.3d 285, 287 (Alaska 2017).

Rogers's immediate supervisor during most of her employment with DHSS was Rita Walker, whose supervisor was Leanna Hunter. At one point Walker's supervisor had been Odette Jamieson, who "remain[ed] in the chain of command to the end of [Rogers's] service" as Hunter's supervisor.

For the first few years Rogers's employment with DHSS was unremarkable, though she described some friction between herself and Walker. Her first performance evaluation, in June 2011, rated her overall performance as "mid acceptable." The evaluation set out goals for the following year, including weekly meetings with Walker, a "[d]ecrease [in] use of unscheduled leave," cross-training for other positions, showing "improvement in acceptance of supervision," and "[c]onsistently follow[ing] chain of command." Rogers strongly disagreed with the rating and asserts that she filed a lengthy rebuttal.

In the summer of 2011 DHSS began to change Rogers's work requirements. Some changes appear to be related to the goals in the June 2011 evaluation; these included expanding Rogers's duties to encompass training in the Medicaid Waiver review process. The parties disagreed about why Rogers's duties increased: Rogers asserted that it was retaliation by Walker, while DHSS contended that it was part of an effort to cross-train her and make better use of her education. Rogers points to a tasks spreadsheet that she and management developed, which in her opinion shows she was being asked to do more than eight hours of work in a seven-and-a-half-hour day.

The record reflects ongoing problems between Rogers and Walker relating to a variety of issues: unexplained absences, Rogers's use of her time while at work, the way she processed incomplete long-term care authorization requests, and her willingness to accept supervision and follow the chain of command.

### 2. Disability accommodations requests

In July 2011 Rogers requested an evaluation of her work station because

of "increased neck and hand pain, . . . with numbness, tingling and loss of strength in both hands." An outside company conducted an ergonomic evaluation of Rogers's work station and recommended modifications, some of which DHSS provided. Rogers was later in two car accidents, and her work station was again evaluated. One recommendation — now a point of contention — was an adjustable desk.

In May 2012, after suffering an attack of Ménière disease which she said was triggered by stress, Rogers filed a request for disability accommodation related to the disease. DHSS did not grant the exact accommodations she requested, but it did provide her with an electronic tablet to help with the hearing impairment that is sometimes a symptom of the disease.

Rogers also suffered from post-traumatic stress disorder (PTSD), though she did not disclose it to her employer until early 2013. According to Rogers, she had no reason to tell DHSS about the condition until problems arose with the rearrangement of her office furniture. She testified that when she returned to work after the Presidents Day holiday in February 2013, she found her desk rearranged so that her back was to the door; she said that working in this position would trigger her PTSD. She and a coworker "reoriented" the desk to face the door. According to Rogers, Walker was displeased and told her the desk had to be turned around. Rogers went to Jamieson, Walker's superior, and explained why she could not work with her back to the door; Rogers testified that Jamieson "allowed [her] to keep [her] desk properly oriented for [her] safety." But Rogers asked Jamieson not to discuss her PTSD diagnosis with others at DHSS.

Rogers had a disciplinary suspension in March 2013, and when she returned to work on April 1 her desk was again oriented with her back to the door. On the door was a notice forbidding the rearrangement of furniture; an email from Hunter explained that Rogers's "furniture configuration had taken up almost the entire office and the second employee [sharing the office] was confined to one corner of the room. Now

the space is more appropriately split." When Rogers complained to Jamieson, Jamieson told her to "work with [her] supervisors on th[is] type[] of request[]." Hunter and Walker learned of Rogers's PTSD diagnosis at this point, and Rogers formally notified them of it on April 2, explaining that her "confidentiality [had] already been breached." She was given paperwork to begin an Americans with Disabilities Act (ADA) accommodations request, and DHSS offered to allow her to work in another office in the meantime. In an email to Walker, Rogers declined "the offer of an interim change in offices" because the desk in the other office was not adjustable but said she would move "if that is still your instruction." She submitted the ADA paperwork for an accommodation related to her PTSD, and on April 12 DHSS agreed to grant her accommodation request.

### 3. Discipline history

Rogers was the subject of progressive discipline a number of times. She was given a Letter of Expectation in March 2008 related to her use of work time, and in April 2009 she received a Letter of Warning about inappropriate communication with her supervisor. She filed a grievance through her union related to the Letter of Warning, contending that the underlying issue was simply "a communications problem" between her and Walker. The grievance was still unresolved when Rogers was fired in 2013.

In November 2011 Rogers was reprimanded in part because she "failed to follow specific instructions to not discuss" a disciplinary process "with anyone outside of [her] supervisory chain of command or union representation"; she had sent an email to the supervisor of another employee who had filed a complaint about her to document what she considered to be inappropriate behavior by that employee. Rogers was given another Letter of Warning in February 2012 because of her use of unscheduled leave and her failure to follow instructions, and she filed a grievance about this letter. In November 2012 and again in March 2013 she was suspended because of difficulties

completing her work, the first time for 5 days and the second for 15 days. Again, she grieved the suspensions through her union.

During the second suspension, staff who were covering Rogers's work discovered a large number of incomplete long-term care authorization requests in her office that had not been reported to her supervisors. In a later interview Rogers acknowledged that "[t]here were 153 all together," and she explained she "could have finished them but [she] was not allowed to do the facilities' share of the work." She said that in the past she had "completed the facilities' share of the work if they were more than a couple weeks behind in getting payment" and that she "viewed it as part of [her] job — to get long-term care authorization completed whether or not the information was provided by the long-term care facility or whether [she] called them to get the correct information from them." This was contrary to established practice; Rogers had been instructed before that it was up to the providers to make necessary corrections to their paperwork.

Rogers was fired on April 12, 2013 — the same day DHSS granted her request for accommodation related to her PTSD — following a contentious investigatory interview. Through her union she filed a grievance contesting the termination. In June 2013 the union settled all of the grievances, including the other four that were pending at the time of her termination: the union withdrew the grievances in exchange for DHSS's agreement to pay Rogers $3,800 and remove a performance evaluation for 2011-12 from her records.

## B. Proceedings

On April 5, 2013, a week before her termination, Rogers filed a complaint with the Alaska State Commission on Human Rights (ASCHR). Shortly afterwards she filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC),

which investigated the complaint, concluded that it was unable to establish any violations of the relevant statutes, and in August 2014 gave Rogers a "Right to Sue" letter.

Rogers, through counsel, filed suit against DHSS, alleging several causes of action: breach of the implied covenant of good faith and fair dealing, failure to provide reasonable accommodations, wrongful termination, retaliation, and discrimination based on disability and age.[3] DHSS answered and moved for summary judgment, which the superior court granted. The court observed that a wrongful termination claim required proof of either a breach of contract or a tort. It decided that Rogers's union settlement barred any claim for breach of the covenant of good faith and fair dealing. It decided that the statute of limitations had run on a claim for failure to reasonably accommodate any disabilities except PTSD, and that DHSS had reasonably accommodated that disability. The court decided that Rogers had established a prima facie case of disability discrimination, that DHSS had carried its burden of demonstrating that it had a legitimate reason for firing her, and that Rogers had failed to show that this reason was actually "an impermissible pretext." The court likewise decided that Rogers had established a prima facie case of retaliation but that DHSS had shown a legitimate reason for her termination which Rogers had not shown to be pretextual.

Rogers, now self-represented, appeals.

## III. STANDARDS OF REVIEW

"We review a grant of summary judgment de novo,"[4] "affirming if the record presents no genuine issue of material fact and if the movant is entitled to judgment

---

[3] Rogers later conceded that she did not have an age-related discrimination claim.

[4] *Mitchell v. Teck Cominco Alaska Inc.*, 193 P.3d 751, 757 (Alaska 2008).

as a matter of law."[5]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Granting Summary Judgment On Rogers's Claim For Violation Of The Covenant Of Good Faith And Fair Dealing.

The superior court based its denial of Rogers's claim for breach of the covenant of good faith and fair dealing on her union's settlement of the five grievances in exchange for a monetary payment to Rogers. The court reasoned that breach of the covenant is a contract-based claim; that the contract at issue was "the Collective Bargaining Agreement between the State and the Alaska State Employees Association"; and that claims based on the covenant therefore had to be pursued by the contractual grievance policy, which had finally resolved them by settlement.

We see no error in this analysis. A cause of action based on the covenant of good faith and fair dealing is a contract claim.[6] An employee represented by a union who wishes to bring an employment-related contract claim against the employer must first exhaust the administrative remedies available through the union or show good cause why exhaustion should be excused.[7] Rogers and her union settled her grievances, and there were therefore no further administrative remedies to exhaust. But her acceptance of the settlement bars litigation of the settled contract disputes.[8]

---

[5] *Hagen v. Strobel*, 353 P.3d 799, 802 (Alaska 2015).

[6] *See Holland v. Union Oil Co. of Cal.*, 993 P.2d 1026, 1032 (Alaska 1999) ("This court has 'recognized a covenant of good faith and fair dealing in all at-will employment contracts.' " (quoting *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1223 (Alaska 1992))).

[7] *See Wilson v. Municipality of Anchorage*, 977 P.2d 713, 724 (Alaska 1999).

[8] *See Plumber v. Univ. of Alaska Anchorage*, 936 P.2d 163, 168 (Alaska (continued...)

Rogers argues, however, that the settlement agreement resolving her grievances should be rescinded for several reasons, including fraud, "misunderstanding," breach of fiduciary duty by her union, lack of consideration, and unconscionability. She appears to argue that the union representative misled her about what she would be giving up by agreeing to the settlement (fraud or misrepresentation) or that she misunderstood what the union representative was telling her (unilateral mistake). In other words, she argues that the fatal flaws in the settlement agreement were due not to DHSS but to her union representation. Her claim could be characterized as a "hybrid claim," involving not only a claim against the employer for breach of the collective bargaining agreement but also one against the union for breach of its duty of fair representation.[9]

But Rogers did not argue in the superior court that the settlement agreement was invalid and should be set aside; her only argument about the grievance process concerned whether she was required to exhaust her remedies. A claim for breach of the duty of fair representation generally raises issues of fact about the union's conduct, none of which were litigated in the trial court in this case.[10] In the absence of any argument

---

[8]    (...continued)
1997) (holding that settlement of one claim barred employee from "relitigating to obtain a better settlement").

[9]    *See Bernard v. Alaska Airlines, Inc.*, 367 P.3d 1156, 1159 n.5 (Alaska 2016).

[10]    *See Cameron v. Chang-Craft*, 251 P.3d 1008, 1018 (Alaska 2011) ("A union breaches its duty of fair representation 'only when [the union's] conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith.' " (alteration in original) (quoting *Schaub v. K&L Distribs., Inc.*, 115 P.3d 555, 562 (Alaska 2005))), *disavowed in part on other grounds by Christensen v. Alaska Sales & Serv., Inc.*, 335 P.3d 514, 520 n.49 (Alaska 2014); *Rollins v. Cmty. Hosp. of San Bernardino*, 839 F.3d 1181, 1186-88 (9th Cir. 2016) (holding there were jury questions about
(continued...)

why the settlement agreement should be set aside, the superior court did not err when it relied on the settlement to bar her contractual claim for breach of the covenant of good faith and fair dealing.[11]

**B.    The Superior Court Correctly Decided That The Statute Of Limitations Barred All But One Of Rogers's Disability Discrimination Claims.**

The superior court decided that the statute of limitations barred disability discrimination claims related to DHSS's actions prior to October 2012.  It relied on a regulation requiring that a complaint alleging a discriminatory act be filed with the Alaska State Commission on Human Rights within 180 days of the act,[12] concluding that "[a]ny acts occurring more than 180 days before the ASCHR complaint [were] . . . untimely."  Because Rogers made her complaint to the Commission on April 5, 2013, the court concluded that causes of action based on "any acts occurring before October 7, 2012 [were] . . . untimely filed."  It concluded that causes of action related to acts prior to October 23, 2012 — two years before she filed her complaint in superior court — were barred in any event because of the two-year statute of limitations on tort actions. Under this ruling, the only allegedly discriminatory acts not barred by the statute of limitations were those related to Rogers's PTSD.

---

[10]    (...continued)
whether union acted arbitrarily and "in a perfunctory manner" when handling plaintiff's grievance); *Addington v. US Airline Pilots Ass'n*, 791 F.3d 967, 982 (9th Cir. 2015) ("Whether a union's conduct amounted to a breach of its duty of fair representation presents a mixed question of law and fact . . . .").

[11]    *Ivy v. Calais Co.*, 397 P.3d 267, 275 (Alaska 2017) ("An argument is ordinarily not preserved for appeal if it was not raised below, or if it was only raised after the party filed a motion for reconsideration.").

[12]    6 Alaska Administrative Code (AAC) 30.230 (2014).

Rogers contends on appeal that the statute of limitations on all her claims should have been equitably tolled because she was pursuing her union grievances. Again, however, she did not make this argument in the superior court, as DHSS points out. While we can in limited circumstances consider issues raised for the first time on appeal,[13] those circumstances are not met here because equitable tolling requires consideration of prejudice to the defendant, which is ultimately a factual issue.[14] The superior court made no findings about prejudice. Because Rogers did not raise equitable tolling in the superior court, that argument has been waived,[15] and she offers no other argument of error on this point. We therefore conclude that the superior court was correct in deciding that the statute of limitations barred Rogers's disability discrimination claims other than the one related to her PTSD.

## C. The Superior Court Did Not Err In Granting Summary Judgment To DHSS On The Claim For Failure To Accommodate Rogers's PTSD.

Rogers argues that DHSS failed to accommodate her PTSD — and in fact purposely acted to trigger it — by twice rearranging her office furniture so that her back was to the door. DHSS counters that once it became aware of Rogers's need for accommodation related to this condition it promptly engaged in an interactive process with her, thus fulfilling its obligations under the ADA.

---

[13] *See Radebaugh v. State, Dep't of Health & Soc. Servs., Div. of Senior & Disabilities Servs.*, 397 P.3d 285, 292 (Alaska 2017) (setting out circumstances when issue not raised below may be considered on appeal).

[14] *See Irby v. Fairbanks Gold Mining, Inc.*, 203 P.3d 1138, 1142-43 (Alaska 2009) (setting out test for equitable tolling and applying it when raised on appeal for the first time because factfinder had considered prejudice in context of another equitable argument).

[15] *See, e.g.*, *Wagner v. Stuckagain Heights*, 926 P.2d 456, 459 (Alaska 1996) (holding that argument not presented in superior court is waived).

"Federal courts have held that the ADA requires an employer to 'engage with the employee in an "interactive process" to determine the appropriate accommodation under the circumstances' once it is aware of the employee's disability."[16] It is undisputed that Rogers had not told any of her superiors that she suffered from PTSD before February 2013, when she told Jamieson that she had to work facing the door and explained why. Jamieson allowed this accommodation once Rogers and a coworker had moved the desk to where Rogers wanted it. It thus appears that DHSS immediately accommodated the disability as soon as Rogers made Jamieson aware of it. But Rogers concedes that she kept her PTSD diagnosis from Walker, her immediate supervisor; she testified at her deposition that she asked Jamieson not to "spread this around" to others at DHSS because it was "private."

Rogers claims that Walker acted intentionally to trigger her PTSD when in April 2013 Walker again oriented the desk so that Rogers's back was to the door, but she offers no evidence that Walker was aware of the PTSD diagnosis at that time. The notes from Rogers's interview with the EEOC indicate that when Rogers returned in April to find the desk oriented so she would have to work with her back to the door, she sent an email to another supervisor informing her of the PTSD and seeking permission to leave for the day because of the stress involved. According to Rogers, the PTSD diagnosis was disclosed to Hunter and Walker at that time. No evidence contradicts Rogers's own assertion that Walker learned of her PTSD only after the desk was reoriented the second time, and this time line is consistent with emails from Rogers and DHSS staff as well as Hunter's deposition testimony.

---

[16]     *Smith v. Anchorage Sch. Dist.*, 240 P.3d 834, 843 (Alaska 2010) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)).

DHSS did not immediately agree to reorient the desk in April, but after Hunter and Walker were made aware of the diagnosis DHSS began the interactive process required by federal law. DHSS gave ADA forms to Rogers and in an email dated April 12 agreed to accommodate her. In short, DHSS agreed to the accommodation Rogers demanded less than two weeks after she advised her direct supervisors of her disability and need for accommodation.

Federal courts have decided that similar time lapses in accommodating ADA requests are reasonable as a matter of law. For example, in *Kintz v. United Parcel Service, Inc.*, the court decided that a "delay of a mere 15 days is not unreasonable under the ADA."[17] Another federal court decided that a 17-day delay was insufficient as a matter of law to support a failure to accommodate claim.[18]

Because DHSS engaged in the interactive process required by the ADA once it was informed of Rogers's PTSD and her need for accommodation, and because it promptly granted her accommodation, summary judgment for DHSS was proper on the claim for failure to accommodate her PTSD.

### D. The Superior Court Did Not Err In Granting Summary Judgment On The Disability Discrimination Claim.

To establish a prima facie case for a disability discrimination claim under AS 18.80.220, a plaintiff must show the following:

> (1) that he or she is an individual who has a disability within the meaning of the statute; (2) that he or she could perform the essential functions of the position he or she holds (with or

---

[17] 766 F. Supp. 2d 1245, 1257 (M.D. Ala. 2011).

[18] *Marks v. Wash. Wholesale Liquor Co.*, 253 F. Supp. 3d 312, 326 (D.D.C. 2017); *see also Keen v. Teva Sales & Mktg., Inc.*, 303 F. Supp. 3d 690, 730 (N.D. Ill. 2018) (granting summary judgment to employer that returned plaintiff to work with accommodations two weeks later than plaintiff requested).

without reasonable accommodation); and (3) that he or she has suffered an otherwise adverse employment decision because of the disability.[19]

This test is derived from the burden-shifting analysis adopted by the U.S. Supreme Court in employment discrimination cases brought under Title VII of the Civil Rights Act of 1964.[20] If the employee can establish a prima facie case, "the burden shifts to the employer to articulate legitimate, nondiscriminatory reasons for the employment action."[21] If the employer meets this burden, the employee must then show "that discriminatory reasons more likely motivated the employer."[22] "Because a complainant can show pretext either directly or indirectly, a variety of factors can evidence a pretextual justification."[23]

Here the superior court determined on summary judgment that Rogers had met her initial burden of demonstrating a genuine issue of material fact as to all three elements. On appeal DHSS challenges this determination, arguing that no facts support a finding that Rogers could perform the essential functions of her position[24] and that the

---

[19]    *Smith*, 240 P.3d at 843 (quoting *Moody-Herrera v. State, Dep't of Nat. Res.*, 967 P.2d 79, 88 (Alaska 1998)).

[20]    *Haroldsen v. Omni Enters., Inc.*, 901 P.2d 426, 430 (Alaska 1995) (citing *Alaska State Comm'n for Human Rights v. Yellow Cab*, 611 P.2d 487, 490 (Alaska 1980)).

[21]    *Raad v. Alaska State Comm'n for Human Rights*, 86 P.3d 899, 905 (Alaska 2004).

[22]    *Id.*

[23]    *Id.*

[24]    A federal regulation defines "essential functions" to mean "the fundamental job duties of the employment position the individual with a disability holds or desires"
(continued...)

trial court put too much weight on the temporal proximity between Rogers's request for accommodation of her PTSD and her firing.

The superior court did not have before it on summary judgment any evidence regarding the essential functions of Rogers's position; neither Rogers's initial job description nor the revised job description was included in the record. Given the dearth of information about the specific functions of Rogers's job, the superior court did not err in finding that Rogers's "mid acceptable" performance evaluation in 2011 adequately supported a prima facie case that she was able to perform the essential functions of her position.

Nor did the court err by using temporal proximity to establish the third prong.[25] Rogers suffered at least two adverse employment actions in close proximity to her attempts to rearrange her office: the February repositioning of the desk was one of the issues in a February investigatory interview that resulted in the 15-day suspension in March, and she was fired within two weeks of her return to the office on April 1 and her request at that time for accommodation of her PTSD.

But we also agree with the superior court that DHSS met its burden of demonstrating the absence of any genuine issue of material fact as to whether it had legitimate reasons for firing Rogers. One legitimate reason was the discovery of many

---

[24]    (...continued)
but "does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1) (2018).

[25]    *See VECO, Inc. v. Rosebrock*, 970 P.2d 906, 919 (Alaska 1999) ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge." (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir. 1986))). The analysis of a disability discrimination claim is similar to that for an unlawful retaliation claim. *See id.* at 918.

pending requests for long-term care authorizations in various stages of the approval process that Rogers had apparently not disclosed to her supervisors. The record supports other reasons as well: Rogers appears to have disregarded instructions about processing incomplete applications; she went outside her chain of command despite admonitions not to do so; and she disregarded directives not to discuss certain personnel issues with others.

Because DHSS met its burden of showing it had legitimate reasons for firing Rogers, the burden shifted to her to show that these reasons were pretextual. Federal courts have held that "the plaintiff must produce 'specific, substantial evidence of pretext,' " or, put another way, "must tender a genuine issue of material fact as to pretext in order to avoid summary judgment."[26] The superior court decided that DHSS was entitled to summary judgment because Rogers provided no evidence she was terminated because of her disability. Although Rogers made many allegations that Walker and others in DHSS acted deliberately to fire her or to overwhelm her with work, she offered no specific evidence that her firing was motivated by her PTSD and request for accommodation of that disability.[27] We agree with the superior court that Rogers failed to present evidence sufficient to show a genuine issue of material fact as to whether DHSS's reasons for firing her were pretextual.

**E.** **The Superior Court Did Not Err In Granting Summary Judgment To DHSS On The Retaliatory Discharge Claim.**

The final question on appeal is whether the superior court erred in granting

---

[26] *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).

[27] In her reply brief Rogers cites documents and depositions that were not filed with the superior court and thus are not part of the record on appeal. *See* Alaska R. App. P. 210(a) (limiting record on appeal to "original papers and exhibits *filed in the trial court*" (emphasis added)).

summary judgment to DHSS on Rogers's retaliation claim. The analysis for a claim of retaliation is similar to that used in a discrimination claim:

> To establish a prima facie case of discriminatory retaliation, a complainant must establish that (1) the complainant engaged in a protected activity (e.g., opposed a discriminatory practice); (2) the complainant suffered an adverse employment action; and (3) there was a causal link between the protected activity and the employer's action.[28]

"Causation may be inferred from the proximity in time between the protected action and the allegedly retaliatory action."[29] The superior court found that Rogers met her burden of showing a prima facie case. The court decided that her union grievances and discrimination complaint to ASCHR were protected activities and that she suffered the adverse employment action of being fired. It then decided that she had satisfied the final element — the causal link — because of temporal proximity.

DHSS challenges this threshold determination, arguing that there is no evidence to support a causal link between the protected activity and the employer's actions. It contends that the timing of the ADA accommodation and Rogers's firing was "pure coincidence" and cannot serve as a basis for meeting the third element.

We again agree with the superior court that Rogers made a prima facie case of retaliation. She was disciplined shortly after she repositioned her desk in mid-February, despite explaining that Jamieson had authorized it. She had multiple union grievances pending at the time of her dismissal, including one related to the February 2013 discipline, and she was fired shortly after she filed the request for accommodation of her PTSD.

---

[28]     *Raad*, 86 P.3d at 905.

[29]     *Id.*

-17-                                                              **7340**

Once the plaintiff claiming retaliatory discharge has established a prima facie case, "the burden in a pretext case shifts to the employer to show a legitimate, non-retaliatory reason for the discharge."[30] As set out above, DHSS was able to demonstrate the absence of a genuine issue of material fact as to whether it had legitimate reasons for firing Rogers. The burden then shifted to Rogers "to show that discriminatory reasons more likely motivated the employer."[31] She argued in the superior court that she met the burden through temporal proximity and through evidence that her supervisors were aware of the grievances. However, she was "required . . . to offer something more than 'unsupported assumptions and speculation' " in order to create a genuine issue of material fact.[32]

On appeal Rogers offers little in the way of evidence to support her contentions. For example, she asserts that Walker purposely triggered her PTSD by repositioning her desk during her suspension, but Rogers's own statements indicated that Walker found out about the PTSD diagnosis only after Rogers returned to work. No *fact* that Rogers points to substantiates her claim that DHSS retaliated against her for making the ADA request related to her PTSD or for grieving her concerns through the union process.

Because DHSS showed it had a legitimate reason for terminating Rogers's employment and Rogers failed to provide evidence sufficient to create a genuine issue of material fact as to whether that reason was pretextual, the superior court did not err in granting DHSS summary judgment on the retaliatory discharge claim.

---

[30]   *Mahan v. Arctic Catering, Inc.*, 133 P.3d 655, 660 (Alaska 2006).

[31]   *Raad*, 86 P.3d at 905.

[32]   *Mahan*, 133 P.3d at 661 (quoting *French v. Jadon, Inc.*, 911 P.2d 20, 25 (Alaska 1996)).

## V.  CONCLUSION

We AFFIRM the superior court's judgment.